IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DONALD D. GADDIS,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**FRANKLIN-WILLIAMSON**<br>**BI-COUNTY HEALTH DEPARTMENT,**<br><br>    **Defendant.** | Case No. 3:18-CV-2170-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

  This action stems from the resignation of Plaintiff Donald D. Gaddis ("Gaddis") from the Franklin-Williamson Bi-County Health Department ("the Department") in December 2017 (Doc. 1). Gaddis's Complaint alleges a claim under 42 U.S.C. §1983 for retaliation for exercising his right to free speech on November 13, 2017, while he was an employee of the Department. Gaddis claims that, as a result of his speech, he was harassed and received a warning letter that essentially forced him to resign (*Id.*). The Department denies any retaliation and now moves for summary judgment (Doc. 34). For the reasons set forth below, the motion for summary judgment is granted.

### BACKGROUND

  Gaddis began his employment as a health inspector with the Department in 2007 (Doc. 35-1, p. 4). As a health inspector, Gaddis would perform restaurant inspections, ensure sewage systems are permitted and installed properly, and enforce county

nuisance ordinances (*Id.*). Beginning in 2015, a number of changes occurred within the Department that made it difficult for Gaddis to perform his job. Gaddis had a set territory to cover within Franklin and Williamson counties in Illinois, but that territory expanded in 2015 when a co-worker retired (*Id.* at pp. 4-5). Due to financial issues, the Department was unable to hire someone to fill the position, and that individual's territory was divided among the remaining inspectors (*Id.* at pp. 4-5). This placed an additional burden on Gaddis, which he mentioned to Department Director Tony McEntire (*Id.* at p. 5). Gaddis also was moved from his private office to an open office setting (Doc. 35-1, p. 105). As an inspector enforcing county codes, Gaddis often had to make phone calls that involved intense conversations and confrontation with the public; therefore, the lack of a private office made it difficult for him to perform his expected work activities (*Id.*).

In 2016, Gaddis began having issues with other employees and supervisors. On August 25, 2016, co-worker Debbie Morgan sent an email to Director McEntire stating that, earlier that day, she was leaning over the computer of Chris Kane, Gaddis's direct supervisor, looking at something he was showing her (Doc. 35-1 at p. 118). Gaddis asked "with a stern voice and wild eye" if what they were doing was work related. When she admitted it was not, Gaddis loudly, and in a demeaning tone, told her to get out of his office (*Id.*). Morgan wrote that Gaddis had a "crazy look in his eyes." (*Id.*). According to Gaddis, however, Morgan was harassing him by coming to his work area "with her ass in my face" for five minutes (*Id.* at p. 31).

The following day, Gaddis had an incident with Carrie Eldridge, Director of Health Education, regarding her playing music in the middle of the open office (*Id.* at

pp. 12, 119). Eldridge agreed to keep her radio on her desk instead (*Id.* at p. 119). She later agreed to only play the radio at certain times because Gaddis disliked the lyrics of the music she played (*Id.* at p. 120). Gaddis testified that Eldridge harassed him by playing her radio during the workday, so much so that he hid her radio in the closet (*Id.* at pp. 36-37). McEntire gave Gaddis a verbal warning not to touch the radio or any personal items in Eldridge's area (*Id.* at p. 41).

On June 5, 2017, Gaddis had an altercation with his supervisor, Kane (*Id.* at pp. 41-42). Gaddis called Kane a coward, and Kane told Gaddis to "go to Hell." (*Id*. at p. 42). Gaddis testified that he called Kane a coward because Kane had watched another inspector take pens off of Gaddis's desk, and even Kane's own desk, but did nothing about it (*Id.*). Gaddis further testified that Kane was unqualified and not a leader because a leader must have the strength to stand up to wrongdoing (*Id.*).

In August 2017, Kevin Kaytor became the Chief Administrator for the Department (Doc. 35-3 at p. 9). Kaytor was appointed by Brent Gentry, a member of the Board of Directors for the Department, as well as other board members (Doc. 35-2 at p. 10). Gaddis felt that Kaytor was hired by the Board without the core values of the Department in mind. Gaddis also believed Kaytor was unqualified to head the Department because he was totally inexperienced and had no leadership skills (*Id.*). Kaytor, however, has an advanced degree and has worked as a health care administrator for more than 20 years (Doc. 35-3 at p. 7).

Around this same time, Gaddis had an issue with co-worker Judy Dorris. Dorris had told everyone they needed to shut down their computers because the servers were

going to be turned off (Doc. 35-1 at p. 44). Gaddis testified he did not hear her, but later admitted that she had "yelled" to him to turn off his computer (*Id.*). In response, he told her to come shut it down (*Id.* at p. 45). Gaddis explained that as a health inspector he deserved a certain amount of respect, but the women in the office tried to control him, boss him around, and disrespect him (*Id.*).

On August 29, 2017, Gaddis received a verbal warning from McEntire because his behavior with Dorris was unacceptable (*Id.* at p. 47). Gaddis told McEntire he was getting sick of how things are at the Department, and McEntire told Gaddis he could hit the road at any time (*Id.* at p. 124). Gaddis also was warned that termination was possible if problems continued (*Id.* at p. 125).

On November 13, 2017, Gaddis attended a meeting of the Department's Board of Directors (*Id.* at pp. 7-8). Gaddis spoke out about the Department's financial situation as well as its "lack of core values." (*Id.* at p. 10). Gaddis also said the Department was going in a different direction than it had historically (*Id.*). With regard to the financial issues at the Department, Gaddis testified that the Board disregarded his input (*Id.* at p. 10).

On December 7, 2017, co-worker Brenda Triplett, a newer employee, reported that Gaddis's behavior was disturbing and frightful to her (*Id.* at p. 49). She recounted an incident where Gaddis told Danelle Morhet, the "front desk person," that if she was going to go skydiving, it would be great if she skydived over big, sharp rocks so that her body and blood would splatter everywhere (*Id.*). He also suggested that she skydive over crocodiles so they could catch her and he could hear her body being ripped to shreds (*Id.*). Gaddis testified that it was just a joke between him and Morhet, whom he had known for

ten years, and that he didn't say anything about her blood (*Id.*). He also admitted telling Morhet that she needed to walk to work every day in snow and ice so her feet would be bleeding and damaged, but he claimed this was another joke (*Id.* at p. 52).

On December 6, 2017, Triplett made Gaddis a small, paper Christmas stocking. Triplett was expecting Gaddis to be happy about the stocking, but instead Gaddis became furious that a stocking was made for him, as his previous stocking had gone missing and he said he didn't want another one (*Id.* at pp. 52-53). Gaddis testified that Triplett must have done it on purpose to harass him and get glue and glitter all over his desk (*Id.*). Gaddis explained he had to be a leader in a place where he was not the leader, and that is why his co-workers attacked him (*Id.* at p. 50).

On December 11, 2017, another newer employee, Debra Johnson, filed a report stating that she had been whispering at her desk with Kim Spruell, a nursing supervisor, when Gaddis came up to them and loudly told them how upset he was with the whispering (Doc. 35-1 at p. 138). Gaddis testified that the women were gossiping in his work area—"having a girl discussion or something"—which affected the nature of the relationships in the Health Department. And because his supervisor, Kane, was a "coward" and Kaytor was a "bad leader," Gaddis was the one that had to say something (*Id.* at pp. 54-55).

On December 11, 2017, the female employees went to Kaytor and discussed their concerns with Gaddis. In addition to their complaints mentioned above, they told Kaytor that Gaddis made gestures they found physically threatening, such as mimicking chopping off fingers with a paper cutter and watching them bleed (Doc. 35-3, p. 74-75).

On December 14, 2017, a meeting was held in Kaytor's office, and Gaddis was presented with a warning letter by the Department's attorney (*Id.* at p. 14). The letter stated:

> The purpose of this <u>Confidential Warning and Notification</u> is to inform you of numerous complaints that have recently been reported to me from various employees of Bi-County Health Department concerning your attitude and conduct towards them.
>
> While numerous employees have recently come forward to me, as the Director, concerning conduct which they perceive to be severe and pervasive intimidation, many of these employees are reluctant to provide their names because of their fear of retaliation by you towards them. You are advised, however, that a sufficient number of people have come forward concerning your conduct which makes it clear that you are creating a hostile and intimidating workplace, such that the Department finds it necessary to take definite steps **to stop the conduct which is persistent, unwelcome, severe, intimidating, offending, degrading, or humiliating of other employees**. An atmosphere of fear and intimidation not only affects the productivity of the Department, but it makes the facility an unpleasant place -- an unpleasant work environment.
>
> I am in hopes that you will cooperate in the Department's endeavors to maintain a work environment free of fear, intimidation, and hostility. I believe that you contain valuable skills to the Department, and I would like to think that you would continue your employment with us for a long time.
>
> I am, of course, willing to meet with you to discuss this letter, as well as to discuss your future with the Department. Should you desire a meeting, please contact my office, and we will set up a time to accomplish that. You may, of course, have someone with you during any meeting, and I will be sure to accommodate the time and place to accomplish that.
>
> **You are not to contact any employee concerning the content of this Confidential Warning and Notice.**

(Doc. 35-1 at p. 129). The letter was signed by Kevin Kaytor.

Kaytor testified that after the women raised their concerns, he called the Department's attorney because he believed the accusations were severe enough that his

staff members were concerned for their safety (Doc. 35-3, pp. 27, 43-44, 49, 63). Kaytor did not share this information with McEntire initially because he did not believe it was necessary to do so prior to contacting the Department's attorney (*Id.* at p. 54).

As a result of that meeting and the warning letter, Gaddis testified that it became impossible for him to perform his expected work activities. Gaddis believes that these women, who had little to no work history with him, were "guided" by Kaytor in writing their complaints, as well as their own misperceptions of Gaddis (Doc. 35-1 at p. 8). He also believes that Gentry and Kaytor orchestrated the entire scheme to retaliate against him for speaking up at the November 13, 2017 Board meeting (Doc. 35-1, p. 8).

On December 15, 2017, Kaytor sent an email to all staff regarding revisions to employee responsibilities and the chain of command (Doc. 35-2 at p. 67). Gaddis emailed all staff saying, "Kevin Kaytor does not follow chain of command and uses harassing abusive tactics. These tactics are then to be kept confidential." (*Id.*). Gaddis sent another all-staff email on December 16, 2017, stating, "People do stupid stuff because they think they will get away from it." (*Id.* at p. 68). The following day, Gaddis resigned via a third all-staff email (*Id.* at p. 69).

Angela Cobb, supervisor of the home health division and a friend of Gaddis, testified she never heard about Gaddis harassing or intimidating any other employee prior to his departure (Doc. 36-1 at p. 23). Cobb further testified that Kaytor and Eldridge appeared to be friends (*Id.* at pp. 39-42). Amy Crespi and Pamela Bennett, two other co-workers and friends of Gaddis, also testified that they never witnessed any inappropriate behavior by Gaddis or had heard that he threatened anyone (Doc. 36-2 at p. 10; Doc. 36-

3 at p. 13). After Gaddis left the Department, his mother called McEntire, who told her Gaddis's resignation made no difference because he was going to be fired anyway on Monday, December 18, 2020 (Doc. 36-4). McIntire stated that the Department was upset because Gaddis had issued an email complaining about not being treated fairly (*Id.*).

## LEGAL STANDARD

Summary judgment is only appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

## ANALYSIS

As an initial matter, Gaddis has not refuted the Department's facts as required by Federal Rule of Civil Procedure 56(e) and Local Rule 7.1(e). Accordingly, the Court finds those facts to be undisputed for the purpose of this motion. *See* FED. R. CIV. P. 56(e). Gaddis does argue, however, that the allegations by his accusers constitute inadmissible hearsay and should not be considered because they were not in the form of an affidavit. The Court disagrees. The Department submitted evidence of the allegations against Gaddis in the form of e-mail records, the narrative record in Gaddis's employment file, and reports signed and dated by the employees. The Court is hard pressed to believe this evidence would not be admissible as records kept in the normal course of business under Federal Rule of Evidence 803(6). Therefore, the Court will consider the employees' complaints as valid summary judgment evidence.

### A.  Applicable Law

The First Amendment generally prohibits state officials from retaliating against an individual who has engaged in protected speech. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L.Ed.2d 1 (2019). "If an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Id.* at 1722.

In the public employment context, a Section 1983 claim for retaliation in violation of First Amendment rights involves a three-part analysis: (1) whether the speech is "constitutionally protected," (2) whether the speech was a "substantial or motivating

factor in the retaliatory action," and (3) whether the retaliatory motive was a "but-for" cause of the injury, *i.e.*, whether the same action would have been taken in the absence of the employee's protected speech. *Isabell v. Trustees of Indiana Univ.*, No. 3:18CV364 DRL-MGG, 2020 WL 94070, at *7 (N.D. Ind. Jan. 7, 2020) (quoting *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004)).

The retaliatory conduct must be sufficiently adverse to deter the exercise of an employee's First Amendment rights. *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000). "Any deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else, is actionable, even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday . . . if . . . the circumstances are such as to make such a refusal an effective deterrent to the exercise of a fragile liberty." *Id.* A "campaign of petty harassment" or "false accusations" all may suffice. *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995).

**B.    Discussion**

The Department concedes that Gaddis's speech at the November 13, 2017 Board meeting was, at least in part, protected speech. Thus, the Court turns to the remaining two elements of his claim: whether the speech was a "substantial or motivating factor in the retaliatory action," and whether the retaliatory motive was a "but-for" cause of Gaddis's injury.

At the summary judgment stage, a plaintiff must show his speech was a "motivating factor" in the deprivation of his federally protected right. *Isabell v. Trustees of*

*Indiana Univ.*, No. 3:18cv364 DRL-MGG, 2020 WL 94070, *7 (N.D. Ind. Jan. 7, 2020) (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011)). The burden then shifts to the defendant "to rebut the causal inference raised by the plaintiff's evidence." *Id.* (quoting *Kidwell*, 679 F.3d at 965). "To demonstrate the requisite causal connection in a retaliation claim, [a] plaintiff[ ] must show that the protected activity and the adverse action are not wholly unrelated." *Id.* (quoting *Kidwell*, 679 F.3d at 966).

Here, Gaddis has failed to present evidence that his protected speech on November 13, 2017, was a motivating factor in the issuance of the warning letter on December 14, 2017. While Gaddis believes that Gentry, the Board member, directed Kaytor to issue the warning letter, he has provided no proof to support his allegations other than his testimony that he heard Kaytor talking to Gentry after the Board meeting (Doc. 35-1 at p. 29). He also has provided no proof—other than his own unfounded belief—that Gentry and Kaytor orchestrated a scheme to have his co-workers submit false accusations so that he would receive a warning letter, essentially forcing him to resign, all because he made comments at the Board meeting about the Department's culture and finances. In fact, Gentry testified that he does not know Gaddis and had never met him before November 13, 2017 (Doc. 35-4 at p. 17).

Gaddis also argues the approximate thirty days between the November 2017 Board meeting and the December 2017 warning letter was brief enough to create a reasonable inference of retaliation. The Seventh Circuit has held that suspicious timing is rarely enough on its own to create a triable issue. *Kidwell*, 679 F.3d at 966. "Accordingly,

Page 11 of 13

for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct.'" *Id.* (quoting *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001)). Whether the retaliatory action follows "close on the heels" of the speech depends on the context of the case. *Id.* Importantly, however, where a "significant intervening event" separates the speech from the adverse action, a suspicious-timing argument will not prevail. *Id.* at 967 (citing *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 675 (7th Cir. 2011)).

Between the November 2017 Board meeting and the warning letter, a number of significant intervening events occurred. Gaddis made disturbing remarks to several co-workers involving dismemberment, and he lashed out at other employees for whispering and for making him a Christmas stocking. Most significantly, the female employees approached management about their fear of Gaddis. Because these events occurred after the Board meeting, the Court finds that the timing of events does not give rise to a reasonable inference that Gaddis's speech was a motivating factor in the issuance of the warning letter. While the Court is aware that it must construe all inferences in favor of Gaddis, he simply has failed to provide any evidence that the warning letter he received on December 14, 2017, was motivated by anything other than his own conduct toward his co-workers and supervisors.

Even if Gaddis could prove his speech was a motivating factor in the retaliatory action, the Department has presented evidence that the warning letter would have been

issued even in the absence of the Gaddis's protected speech. Kaytor testified that he decided to speak with the Department's attorney after several female employees expressed their concern about Gaddis. Kaytor explained that he called the Department's attorney, who then drafted the warning letter, because the accusations were severe and his staff members were concerned for their safety. Gaddis has presented no evidence to refute this testimony, other than his own unsupported belief that the letter was written by Kaytor at the direction of Gentry. Such speculation is insufficient to survive summary judgment. *Armato*, 766 F.3d at 719.

## CONCLUSION

Because Gaddis has failed to show that there is a genuine issue of material fact for trial, the Court **GRANTS** the Motion for Summary Judgment filed by Defendant Franklin-Williamson Bi-County Health Department (Doc. 34). Plaintiff Donald Gaddis shall recover nothing. The Clerk of Court is **DIRECTED** to enter judgment and close this case.

**IT IS SO ORDERED.**

DATED:   May 29, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**